**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHERWIN DROBNER, | Civil Action No. _____ |
| Plaintiff, | |
| -vs.- | |
| WANG HONGJUN, ROBERT C. BRUCE, EDWARD M. RULE, LI JINGFU, YU LIGUO, JU GUIZHI, ZHANG YANG DIO, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| -and- | **JURY TRIAL DEMANDED** |
| CHINA NORTH EAST PETROLEUM HOLDINGS LIMITED, a Nevada Corporation, | |
| Nominal Defendant. | |



Plaintiff, derivatively on behalf of China North East Petroleum Limited, by his undersigned attorneys, alleges upon information and belief, except as to allegations about himself, which are based upon personal knowledge, as follows:

## NATURE OF THE CASE

1.      This is a shareholder derivative action on behalf of nominal defendant China North East Petroleum Holdings Limited ("China North" or "the Company"), a Nevada corporation with its principal executive office in New York City.  China North engages in oil drilling project management, including the exploration and extraction of crude oil from oil fields in Northern China.  The defendants are several of the Company's current or former directors and officers, including a majority of the Company's current directors.  Plaintiff seeks to recover, for the benefit of China North, damages suffered as the result of defendants' breaches of fiduciary duty, intentional misconduct, and fraud.

2.      As alleged herein, during the period May 15, 2008 through May 26, 2010 (the "Relevant Period"), defendants engaged in intentional misconduct and/or consciously and egregiously ignored their fiduciary duties.  Such intentional acts and omissions, include, among other things, (1) improper cash transfers made by the Company's Chairman and Chief Executive, and his mother, who was also a director, between their private bank accounts and the bank accounts of the Company and its subsidiaries; and (2) the wholesale failure by defendants to implement and maintain adequate internal financial controls such that the Company's financial statements for all of 2008 and the first three quarters of 2009 had to be restated, with an estimated total downward adjustment to the Company's net income of $28 million.

3.      Defendants' breaches of fiduciary duty have damaged the Company by forcing it to expend significant resources on the restatement of its financial reports and on audits of its internal controls and have exposed the Company to potentially significant liability in a series of securities fraud class action cases filed in this judicial district.  Furthermore, defendants have severely damaged the Company's reputation.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and (2) in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and plaintiff and defendants are citizens of different states and/or citizens of a foreign state.

5.      This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 and/or 28 U.S.C. § 1401 because the nominal defendant has its primary executive office in this judicial district and

could bring suit in this judicial district against the individual defendants.  In addition, a

substantial part of the events alleged herein occurred in this judicial district.

## PARTIES

7.      Derivative plaintiff Sherwin Drobner ("Plaintiff") held China North shares at

relevant times and continues to hold China North shares.  Plaintiff is a citizen of Florida.

8.      Nominal defendant, China North, is a corporation organized under the laws of the

State of Nevada, with its principal executive office located at 445 Park Avenue, New York, New

York 10022.  China North engages in the exploration and production of crude oil in the People's

Republic of China.  The Company's stock trades on the NYSE Amex ("AMEX") under the

symbol "NEP."  As discussed below, AMEX halted trading of the Company's stock on May 25,

2010.

9.      Defendant Wang Hongjun ("Wang") has been a China North director since May

2004.  Wang also serves as President/Chief Executive Officer and was the Chairman of the

Board from May 2004 until May 23, 2010.  In addition, Wang is on the Company's Nominating

Committee and Compensation Committee.  On May 23, 2010, the Board of Directors (the

"Board") accepted Wang's resignation as Chairman but agreed to allow Wang to continue as a

director pending the outcome of the Company's forensic audit discussed below.  The Board also

placed Wang on administrative leave from his position as CEO pending the results of the

forensic audit.  Upon information and belief, Wang is a citizen of New York.

10.     Defendant Edward M. Rule ("Rule") has been a China North director since May

27, 2008.  On May 23, 2010, the Board appointed Rule as Chairman of the Board, effective upon

Wang's resignation.  Rule also serves as a member of the Audit Committee, the Nominating

Committee, and the Compensation Committee.  Upon information and belief, Rule is a citizen of China.

11.     Defendant Li Jingfu ("Li") has been a China North director since May 27, 2008. The Board appointed Li as the interim CEO to fill the position while Wang is on administrative leave pending the results of the forensic audit.  Li also serves as a member of the Audit Committee, the Nominating Committee, and the Compensation Committee.  Upon information and belief, Li is a citizen of New York and/or China.

12.     Defendant Yu Liguo ("Yu") was a China North director from June 2005 until he resigned from the Board on November 20, 2009.  Yu is Wang's brother-in-law.  Upon information and belief, Yu is a citizen of China.

13.     Defendant Ju Guizhi ("Ju") was a China North director from November 20, 2009 until she resigned from the Board on May 23, 2010.  Ju is Wang's mother.  Upon information and belief, Ju is a citizen of China.

14.     Defendant Zhang Yang Dio ("Zhang") served as Chief Financial Officer of China North from February 1, 2006 until he resigned on May 23, 2010.  Upon information and belief, Zhang is a citizen of New York and/or China.

15.     Defendant Robert C. Bruce ("Bruce") was a China North director from May 27, 2008 to August 8, 2010, when he resigned from the Board.  According to Bruce's resignation letter, which is attached to the Company's August 12, 2010 8-K, Bruce resigned due to his concerns that the Board of Directors did not support his call for "substantial additional investigation" into the Company's financial statements and compliance with the U.S. Foreign Corrupt Practices Act.  Until his resignation, Bruce served as chair of the Audit Committee.

4

Additionally, in the Company's Proxy Statement filed with the SEC pursuant to Section 14(a) of the Securities Exchange Act on August 6, 2008 ("2008 Proxy"), the Company stated:

> Our Board of Directors has determined that Mr. Bruce qualifies as an "audit committee financial expert" as defined by SEC rules. Mr. Bruce has many years of finance and audit experience, including serving as the chief financial officer and the chair of the audit committee for companies subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934. His current professional responsibilities outside of his role as a Director of the Company require him to supervise principal accounting officers and controllers in the preparation and analysis of financial statements and accounting data.

Upon information and belief, Bruce is a citizen of Maine.

16. The Defendants identified in paragraphs 9 through 15 are sometimes referred to herein as the "Individual Defendants."

17. Defendants Wang, Rule, and Li constitute a majority of the Company's five current directors. The two non-defendant directors, Ruishi Hu ("Ruishi") and Yau-Sing Tang ("Tang") were appointed to the Board on June 28, 2010, and August, 9, 2010.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18. Each of the Individual Defendants, by virtue of his or her management and/or directorship positions, owed to the Company and its shareholders the fiduciary duties of care, loyalty, and good faith. As corporate fiduciaries, the Individual Defendants were required to exercise good faith and prudent supervision over the management, policies, practices, and controls of the financial affairs of China North, including assuring the dissemination of truthful and reliable information concerning the business, operations, and earnings guidance of China North.

19. To discharge their duties as corporate fiduciaries, the officers and directors of China North were required to, among other things:

a.   manage, conduct, supervise, and direct the business affairs of China North

in accordance with the applicable federal, state and local laws, rules and

regulations, and China North's charter and bylaws;

b.   neither violate nor knowingly permit any officer, director or employee of

China North to violate applicable federal laws, rules, and regulations and

state or local laws.

c.   implement and maintain an adequate and functioning system of internal

controls, such that China North's financial statements and other publicly

disclosed information would be accurate;

d.   oversee in good faith and with diligence the Company's compliance with

all applicable laws and regulations and China North's charter and bylaws.

20.   China North maintains a Code of Conduct, which the Company adopted on

August 5, 2008, that specifically addresses the duties of China North's officers and directors

pertaining to the disclosure of Company information in documents filed with the SEC and other

public communications:

> [China North's] officers and directors are responsible for establishing, maintaining and
> periodically evaluating disclosure controls and procedures designed to reasonably ensure
> full, fair, accurate, timely and understandable disclosure in reports and documents filed
> with or submitted to the Securities and Exchange Commission or otherwise disclosed to
> the public.  Officers and directors of the Company must promptly bring to the attention of
> the Audit Committee . . . any information they may have concerning significant
> deficiencies in, or violations of, such disclosure controls and procedures.

21.   Additionally, the Code of Conduct acknowledges the duty of loyalty owed by

employees, officers and directors to the Company, which entails "avoid[ing] any actual or

apparent conflict of interest with the Company."  The Code also states that "employees, officers,

and directors must not engage in fraudulent conduct," which includes "deliberately practiced

6

deception, whether by words, conduct, false or misleading allegations, or by concealment, to secure unfair or unlawful gain."

22.    During the Relevant Period, defendants Bruce, Rule, and Li served on the Company's Audit Committee, thereby assuming certain specific duties related to the supervision of China North's financial reporting and legal and regulatory compliance.  According to the Audit Committee's charter, the Committee is tasked with assisting the Board in, among other things:

> (1) monitoring the quality, reliability and integrity of the accounting policies and financial statements of the Company; (2) overseeing the Company's compliance with legal and regulatory requirements; (3) reviewing the independence, qualifications and performance of the Company's internal and external auditors, [and] (4) overseeing the performance of the Company's internal audit function and independent auditors.

23.    In performing these duties, the charter specifies the actions that members of the Audit Committee are required to perform, which include in relevant part:

> a.    Review and discuss with management and the independent auditor the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.
>
> b.    Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.
>
> c.    Discuss with management and the independent auditor, as appropriate, significant financial reporting issues and judgments made in connection

with the preparation of the Company's financial statements, including [in relevant part]:

i.   the Company's critical accounting policies and practices;

ii.   all alternative treatments of financial information within US generally accepted accounting principles ("GAAP ") that have been discussed with management and the ramifications of the use of such alternative accounting principles; [and]

iii.   any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies.

d.   Discuss with management and the independent auditor the effect on the Company's financial statements of (i) regulatory and accounting initiatives and (ii) off-balance sheet structures.

e.   Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

f.   Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

g.    Review disclosures made to the Committee by the Company's President and CFO (or individuals performing similar functions) during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

h.    Evaluate the qualifications, performance and independence of the independent auditor . . . .

i.    Inquire and discuss with management the Company's compliance with applicable laws and regulations and with the Company's Code of Ethics in effect at such time, if any, and, where applicable, recommend policies and procedures for future compliance.

j.    Review proxy disclosure to ensure that it is in compliance with SEC rules and regulations.

24.    China North's Audit Committee was formed on June 2, 2008. According to the Company's Schedule 14A filed with the SEC on August 6, 2008 (the "2008 Proxy"), "[i]n the fiscal year 2007 and until the formation of the Audit Committee in fiscal year 2008, the Board of Directors performed the functions of the Audit Committee."

25.    As members of China North's Board and/or as officers of the Company, each of the Individual Defendants knew that dissemination of accurate financial information was critical to the Company. Nevertheless, during the Relevant Period, the Individual Defendants utterly

failed to ensure that the policies and financial reporting controls were adequate and that the statements made on behalf of China North were not false or misleading, either causing or permitting the Company to engage in improprieties that have severely damaged the Company.

## SUBSTANTIVE ALLEGATIONS

26.     On February 28, 2008, China North entered into a $15 million debenture agreement with Lotusbox Investments Limited ("Lotusbox"). As part of the agreement, China North agreed to issue detachable warrants exercisable into 4.8 million shares of the Company's common stock. Additionally, China North agreed to obtain a listing on a U.S. stock exchange within one year. In a press release issued on March 3, 2008, Individual Defendant Wang touted the agreement as a "major corporate milestone" for China North.

27.     On May 15, 2008, China North announced its first quarter results for 2008. The Company reported net income of $3,281,259 or $0.17 per diluted share, compared to $287,363 or $0.01 per share for the first quarter of 2007. The Form 10-Q was signed by Individual Defendants Wang, as President and "Principal Executive Officer," and Zhang, as CFO. Wang and Zhang also certified, as required by the Sarbanes-Oxley Act of 2002 ("SOX"), that, among other things, the Company's disclosure controls and procedures had been evaluated during the reporting period and were operating effectively.

28.     Following on the heels of the strong first quarter financial results, China North issued generous bonuses to its top executives. On July 18, 2008, Individual Defendant and former CFO Zhang received 100,000 stock options, which were valued at $4.50 per share. On the same day, Individual Defendant Wang received a total of 250,000 stock options, also valued at the closing price of $4.50. According to a Form 4 Statement of Changes in Beneficial Ownership filed with the SEC on July 6, 2010, Wang exercised all 250,000 options on January

28, 2010, less than a month before the Company announced that its financial statements for all of 2008 were false and misleading and would need to be restated.  On January 28, 2010, the Company's stock closed at $7.89.

29.     On August 14, 2008, China North filed its Form 10-Q with the SEC for the second quarter of 2008, which was signed by and contained required SOX certifications from Individual Defendants Wang and Zhang.  For the period ending June 30, 2008, the Company reported net income of $3,779,007, or $0.19 per diluted share, compared to net income of $1,253,567, or $0.04 per diluted share for the second quarter of 2007.  For the first six months of 2008, net income was $7,060,266, or $0.36 per diluted share, compared to net income of $1,540,930, or $0.05 per diluted share for the first six months of 2007.

30.     On November 14, 2008, China North filed its Form 10-Q with the SEC for the third quarter of 2008, which was signed and certified by Individual Defendants Wang and Zhang. For the period ending September 30, 2008, the Company reported net income of $4,938,917, or $0.24 per diluted share, compared to $1,499,495, or $0.08 per diluted share for the same period in 2007.  For the first nine months of 2008, net income was $11,999,183, or $0.61 per diluted share, compared to $3,040,425, or $0.12 per diluted share for the first nine months of 2007.

31.     On March 6, 2009, China North filed a Form 8-K with the SEC that disclosed the terms of an amendment to the debenture agreement with Lotusbox.  Pursuant to the amendment, Lotusbox extended the requirement that China North effect a listing of its common stock on a U.S. stock exchange until August 30, 2010, and China North agreed to issue additional warrants. The parties also agreed to amend the principal repayment schedule of the Debenture.

32.     On March 30, 2009, the Individual Defendants caused China North to file with the SEC its Form 10-K, which reported the Company's financial results for the year ending

December 31, 2008 (the "2008 10-K"). The 10-K was signed by Wang, Bruce, Rule, Li, and Yu, as directors, and Zhang, as CFO. The Company reported that its year-end net income for 2008 was $19,582,038, or $0.98 per diluted share, compared to $5,132,581, or $0.21 per diluted share in 2007. For the fourth quarter of 2008, the Company's net income was $7,582,855 or $0.37 per diluted share. Net sales for 2008 amounted to $58,572,250.

33.     As with the Company's Form 10-Qs, the 2008 10-K made the following representations pertaining to the effectiveness of the Company's disclosure controls and procedures, which stated in relevant part:

### ITEM 9A(T). CONTROLS AND PROCEDURES
**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15 under the Exchange Act, as of the end of the period covered by this Annual Report, being December 31, 2008, we evaluated the effectiveness of the design and operation of our disclosure controls and procedures. This evaluation ("Evaluation") was performed by our Chief Executive Officer and our Chief Financial Officer in consultation with our accounting personnel.

Based upon the Evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that as of the end of the period covered by this Annual Report, our disclosure controls and procedures were effective.

34.     Furthermore, the Individual Defendants caused the Company to represent in its 2008 10-K that: "We believe that the members of our Board of Directors are collectively capable of analyzing and evaluating our financial statements and understanding internal controls and procedures for financial reporting."

35.     On May 15, 2009, China North filed its Form 10-Q with the SEC for the first quarter of 2009, which was signed and certified by Individual Defendants Wang and Zhang. The Company reported net income for the three month period ending March 31, 2009 of $2,271,353 or $0.11 per diluted share for the first quarter of 2009, compared to $3,281,259, or $0.17 per diluted share, respectively, during the same period in 2008.

36.     On June 15, 2009, China North's common stock was approved by AMEX for listing. The Company's common stock was previously listed on the OTC Bulletin Board under the symbol "CNEH." As discussed below, AMEX halted trading of China North's stock on May 25, 2010.

37.     On July 23, 2009, China North filed an amendment to its May 15, 2009 Form 10-Q for the purpose of revising its disclosure regarding the Company's evaluation of its financial controls and procedures. Similar to the representations made by the defendants in the Company's 2008 10-K and 10-Qs, discussed above, the defendants caused China North to represent that its financial disclosure controls and procedures had operated effectively during the first quarter of 2009 and that there had been no changes in the Company's internal controls that have materially affected, or are reasonably likely to materially affect, the Company's internal controls over financial reporting.

38.     On August 14, 2009, China North filed its Form 10-Q with the SEC for the second quarter of 2009, which was signed and certified by Individual Defendants Wang and Zhang. For the three month period ending June 30, 2009, the Company reported net income of $2,817,577, or $0.13 per diluted share, compared to $3,872,049, or $0.18 per diluted share, respectively, during the same period in 2008 (although the Company had reported net income of $3,779,007, or $0.19 per diluted share, for the second quarter of 2008 in its Form 10-Q filed on August 14, 2008). Net income for the first six months of 2009 was $5,088,930, or $0.24 per diluted share, compared to $7,247,064, or $0.35 per diluted share, respectively, for the comparable period in 2008 (although the Company had reported net income of $7,060,266, or $0.36 per diluted share, for the first six months of 2008 in its Form 10-Q filed on August 14, 2008).

39.     On September 16, 2009, the Company disclosed in a Form 8-K that it had entered into definitive agreements to sell 4 million shares of its common stock at a price per share of $4.60, pursuant to a registered direct offering to several institutional investors.  Under the deal, the investors would also receive warrants to purchase 800,000 shares of China North common stock at $6.00 per share.  China North obtained gross proceeds of approximately $18.4 million from the transaction, which closed on September 21, 2009.

40.     On November 16, 2009, China North filed its Form 10-Q with the SEC for the third quarter of 2009, which was signed and certified by Individual Defendants Wang and Zhang. For the three month period ending September 30, 2009, the Company reported net income of $4,052,709, or $0.17 per diluted share, compared to $4,954,182, or $0.24 per diluted share, respectively, during the same period in 2008 (although the Company had reported net income of $4,938,917 for the third quarter of 2008 in its Form 10-Q filed on November 14, 2008).  Net income for the first nine months of 2009 was $9,141,639, or $0.41 per diluted share, compared to $12,201,246, or $0.62 per diluted share, respectively, for the same period in 2008 (although the Company had reported net income of $11,999,183 or $0.61 per diluted share, for the first nine months of 2008 in its Form 10-Q filed on November 14, 2008).

41.     On November 24, 2009, the Company filed a Form 8-K with the SEC to announce that Individual Defendant Yu (brother-in-law of Individual Defendant Wang) had resigned from the Board effective November 20, 2009.  The 8-K stated that Yu was resigning "due to personal reasons and not because of any disagreement with the Company on any matter relating to the Company's operations, policies or practices."  The 8-K also announced that Individual Defendant Ju (Wang's mother) had been appointed by the Board to replace Yu.

42.     On December 14, 2009, the Company announced that it had entered into definitive agreements to sell 1,963,637 million shares of its common stock at a price per share of $6.875, pursuant to a registered direct offering to several institutional investors. In addition, the investors would receive warrants to purchase 392,728 shares of China North common stock at $8.10 per share. China North obtained gross proceeds of approximately $13.5 million from the transaction, which closed on December 17, 2009.

43.     On January 12, 2010, China North filed a Form 8-K with the SEC to disclose that the Company had used a portion of the net proceeds from the $13.5 million stock issuance to repay in full its 8% Secured Debenture, which the Company had issued to Lotusbox Investments Limited on Feb. 28, 2008. The 8-K stated, in part:

> As of January 11, 2010, the total amount owed on the Debenture was $10,734,739.73, which includes remaining principal plus accrued interest. In addition to using the proceeds from it's [sic] December 2009 public offering, the Company also applied the aggregate exercise price of $2,038,479.30 from the exercise of the Series B Common Stock Purchase Warrants issued to Lotusbox on February 28, 2008 (the "Series B Warrants") to purchase 867,438 shares of the Company's common stock at the exercise price of $2.35 per share to offset the repayment of the Debenture. The Debenture would have matured on February 28, 2012. No early termination or prepayment penalties were incurred by the Company in connection with such termination.

## THE TRUTH IS REVEALED

### "Accounting Errors" and Internal Control Weaknesses Require Restatement of FY 2008 and 2009 Financial Results

44.     On February 23, 2010, China North filed a Form 8-K with the SEC, signed by Individual Defendant Wang, disclosing various accounting errors that would require the Company to restate the Company's financial results for the entire year of 2008 and the first three months of 2009:

**Item 4.02.  Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On February 22, 2010, and as a result of the preparation of the responses to comments China North East Petroleum Holdings Limited (the "Company") received from the Securities and Exchange Commission (the "SEC") in connection with the SEC's review of the Company's Form 10-K for the year ended December 31, 2008, **the Company determined that the Company's financial statements for the year ended December 31, 2008, and each interim quarter within that year, and for the quarters ended March 31, 2009, June 30, 2009 and September 30, 2009 should no longer be relied upon as a result of certain non-cash errors contained therein** regarding the accounting for: (i) warrants issued in conjunction with certain financings in 2008 and 2009, which warrants should have been classified according to EITF-0019 as liability instruments rather than equity instruments; (ii) interest expense calculated using the effective interest method that should have been recorded in each of the reporting periods in question, arising from those certain financings in 2008 and 2009; (iii) changes in the fair value of the reclassified warrants; (iv) ceiling test impairment calculations prepared by the Company for the reporting periods ended December 31, 2008 and March 31, 2009; (v) depreciation, depletion and amortization expenses related to the Company's oil and gas properties, net; (vi) recognition of employee stock-based compensation expense; and (vii) a March 5, 2009 modification of the February 28, 2008 secured debenture, which modification should have been treated as an extinguishment pursuant to EITF 96-19.

The Company is currently evaluating the cumulative impacts of these non-cash charges to the financial statements for the reporting periods in question, and will issue further disclosure detailing the impact and the net result of these changes to the financial statements as soon as possible.  The Company is preparing amended reports for the December 31, 2008 Form 10-K and 2008 and 2009 Forms 10-Q in question, including restated financial statements, and will file those amended reports with the SEC when they are completed.  As all of the errors noted herein are non-cash charges, the Company will not report any change to its previously disclosed revenues, cash balances or liquidity and capital resources disclosures.

The audit committee of the Company's board of directors has discussed the forgoing matters with the Company's Chief Financial Officer and its current and former independent registered public accounting firms. [Emphasis Added]

45.     On March 8, 2010, China North filed a Form 8-K/A (Amendment No.1) with the SEC, signed by Individual Defendant Wang, for the stated purpose of providing "information regarding the quantitative impact of pending restatements of the Company's financial statements" for the entire year of 2008 and the first three quarters of 2009.  The total downward

adjustments amounted to more than $20 million, although, as discussed below, this figure would prove to be conservative.

46.    Near the conclusion of the March 8, 2010 Form 8-K/A, China North disclosed for the first time that the Company's need to restate nearly two years' worth of financial reports was caused by a "material weakness" in the Company's financial reporting internal controls:

> In conjunction with the forthcoming issuance of the amended financial reports, **the Company will disclose a material weakness regarding its internal controls over financial reporting.** The Company has engaged an external consultant with expertise in financial accounting and reporting, including specifically the additional reporting requirements affecting oil and gas producing companies, to assist with the Company's efforts to maintain effective internal controls over financial reporting.
>
> The audit committee of the Company's board of directors has discussed the forgoing matters with the Company's Chief Financial Officer and its current and former independent registered public accounting firms. [Emphasis added]

47.    The Company also issued a press release on March 8, 2010, repeating the information supplied in the Form 8-K/A and concluding with the following statement from Individual Defendant Wang:

> While we regret the need to revise our 2008 and 2009 financial statements, I'd like to emphasize that our accounting adjustments are non-cash in nature and do not impact our previously reported revenues, cash balances or EBITDA nor do they impact our operational performance. Our adjusted non-cash adjustments resulted in a gain to our net income for the 2008 fiscal year and negatively impacted our net income through the first nine months of 2009. We are proactively addressing our accounting issues and are taking the necessary steps to strengthen our financial reporting and auditing functions. Such efforts will only make our company stronger as we move forward. We look forward to reporting our fourth quarter 2009 financial results toward the end of March.

48.    However, the Company did not report its 2009 financial results at the end of March. Nor did the Company meet the April 15, 2010 deadline to timely file its 2009 results with the SEC. On April 15, 2010, China North issued a press release, which stated:

The Company is unable to prepare and review all necessary information and disclosures in its Annual Report on Form 10-K by its April 15, 2010 filing deadline without incurring unreasonable effort and expense. Due to this filing delay, the Company has postponed the issuance of its 2009 financial results press release as well as its earnings conference call with investors originally scheduled for April 15, 2010 at 8:30 am ET. The Company remains committed to filing its Annual Report on Form 10-K as soon as possible. Prior to the filing of the form 10-K, the Company plans on issuing a press release announcing a specific date and time in which it plans to issue its FY09 financial results press release and conduct its 2009 financial results conference call.

49.     The following day, on April 16, 2010, China North disclosed that the Company had received written notice from AMEX that, due to the Company's failure to file its annual financial report for 2009, the Company was not in compliance with AMEX's continuing listing requirements. The notice informed China North that AMEX could suspend or wholly remove the Company's stock from the exchange, unless "prompt corrective action is taken." In the press release, the Company stated that it "intends to comply with requirements set forth in the written notice by submitting a plan of compliance to AMEX by April 29, 2009 advising AMEX of the actions the Company intends to take to bring the Company into compliance with the applicable provisions of the Company Guide by July 14, 2010. The Company intends to file its 2009 Form 10-K in the coming weeks and therefore believes that it will be in compliance with AMEX listing rules well before July 14, 2010."

50.     China North's April 16, 2010 press release also disclosed the nature of the Company's "internal control deficiencies," which the Company had stated would be forthcoming in its March 8, 2010 Form 8-K/A. The press release stated, in relevant part:

> In addition, in the process of the Company's 2009 year end audit review, **the Company identified certain potential internal control deficiencies over financial reporting in connection with certain expenditures relating to business development activities and the accounting treatment of certain of the Company's accounts payables.**

18

The Board of Directors has directed and authorized the Audit Committee of the Board of Directors to conduct a thorough review of the situation and to determine what corrective action, if any, should be taken.

**Until the completion of the review of the Company's internal control deficiencies, the Company is unable to finalize its amended and restated financial reports or its audited financial statements for the year ended December 31, 2009.** The Company is working expeditiously to complete the internal control review, and expects to file amended and restated annual and quarterly reports for the periods ending March 31, 2008, June 30, 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009 and September 30, 2009, and its Annual Report on Form 10-K for the year ended December 31, 2009 on or before June 15, 2010. **The Company has engaged an external consultant with expertise in financial accounting and reporting, including specifically the additional reporting requirements affecting oil and gas producing companies, to assist with the Company's efforts to maintain effective internal controls over financial reporting.** [Emphasis added]

51.     Additionally, the Company provided preliminary, non-GAAP financial results for

2009. After announcing record revenues of $64.7 million, the Company stated:

Full year 2009 preliminary non-GAAP adjusted EBITDA(l) was $49.6 million, or $2.21 per common share. **The Company incurred a preliminary GAAP net loss of $22.1 million, or ($0.99) per diluted share, in 2009. The net loss was primarily due to $49.5 million in non-cash charges related to the impairment of oil and gas properties, change in fair value of warrants and loss on extinguishment of debt.** These expenses were $13.8 million, $27.4 million and $8.3 million, respectively. [Emphasis added]

52.     China North attached its April 16, 2010 press release as an exhibit to a Form 8-K

that it filed with the SEC on the same day. The 8-K noted that the Company intended to submit

its compliance plan to AMEX by April 29 and to file its 2008 10-K with the SEC "as soon as

possible."

53.     On April 20, 2010, the Company filed with the SEC a second Form 8-K/A

(Amendment No. 2) to provide "revised information on the quantitative impact of pending

restatements of the Company's financial statements for the year ended December 31, 2008 and

for the six quarters ended March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009,

June 30, 2009 and September 30, 2009 due to certain non-cash errors as disclosed in the Original

8-K and Amendment No. 1."

54.    The April 20 8-K/A made the following revised adjustments to net income:

**2008 Information**

| | Three Months ended March 31, 2008 | Three Months ended June 30, 2008 | Three Months ended September 30, 2008 | Three Months ended December 31, 2008 | Year ended December 31, 2008 |
|---|---|---|---|---|---|
| Net income (as previously reported): | 3,281,259 | 3,779,007 | 4,938,917 | 7,582,855 | 19,582,038 |
| **Adjustments in Period:** | | | | | |
| Depreciation, depletion and amortization of oil properties | -- | -- | -- | 2,437,086 | 2,437,086 |
| Selling, general and administrative expenses, including employee stock-based compensation expense | -- | 7,736 | 733,696 | 106,294 | 847,726 |
| Professional fees | 112,939 | 26,740 | 26,740 | (77,286) | 89,133 |
| Consulting fees | (16,227) | 79,185 | (208,018) | 8,361 | (136,699) |
| Loss (Gain) on change in fair value of warrants | 2,000,697 | 15,044,528 | (18,191,606) | (3,317,810) | (4,464,191) |
| Amortization of deferred financing costs | 55,299 | 146,500 | 144,803 | 137,771 | 484,373 |
| Amortization of discount on debenture | 208,978 | 536,935 | 529,061 | 496,434 | 1,771,408 |
| Impairment of oil properties | -- | -- | -- | 13,184,103 | 13,184,103 |
| Income tax expense | -- | -- | -- | (3,824,631) | (3,824,631) |
| Minority interests | -- | -- | -- | (1,326,695) | (1,326,695) |
| Total of adjustments in period | 2,361,686 | 15,841,624 | (16,965,324) | 7,823,627 | 9,061,613 |
| Net income (as adjusted) | 919,573 | (12,062,617) | 21,904,241 | (240,772) | 10,520,425 |

2009 Information

| | Three Months ended March 31, 2009 | Three Months ended June 30, 2009 | Three Months ended September 30, 2009 |
|---|---|---|---|
| Net income (as previously reported): | 2,271,353 | 2,817,577 | 4,052,709 |
| | | | |
| **Adjustments in Period:** | | | |
| Depreciation, depletion and amortization of oil properties | 455,376 | (591,793) | (453,637) |
| Selling, general and administrative expenses, including employee stock-based compensation expense | 106,292 | 107,518 | 105,934 |
| Professional fees | 26,740 | (78,873) | 6,964 |
| Consulting fees | (60,274) | (26,026) | (53,067) |
| Loss (Gain) on change in fair value of warrants | (653,705) | 12,731,750 | (2,272,159) |
| Amortization of deferred financing costs | 70,368 | (74,140) | (74,139) |
| Amortization of discount on debenture | 177,789 | (509,355) | (513,415) |
| Impairment of oil properties | 13,825,567 | -- | -- |
| Income tax expense | (1,419,819) | (1,667,848) | (230,367) |
| Minority interests | 96,443 | 226,645 | 68,545 |
| | | | |
| Total of adjustments in period | 12,624,777 | 10,117,878 | (3,415,341) |
| | | | |
| Net income (as adjusted) | (10,353,424) | (7,300,301) | 7,468,050 |

55.     As seen in the above figures, whereas the Company had reported positive net income in each quarter of 2008 and the first three quarters of 2009 in its original SEC filings, the Company was now estimating net *losses* in four of the seven financial quarters. Moreover, China North's revised estimate of the total adjustment to the Company's net income for 2008 and the first three quarters of 2009 now equaled more than $28 million.

56.     On May 18, 2010, the Company filed Form 12b-25, Notification of Late Filing, with the SEC, in which it advised investors that it would be unable to timely file its Form 10-Q for the first quarter of 2010. The Form was signed by Individual Defendant Wang. The reason given for the delay was that "Registrant did not obtain all the necessary information prior to the filing date and the attorney and accountant could not complete the required legal information and financial statements and management could not complete the Management's Discussion and Analysis of such financial statements prior to May 17, 2010."

21

57.     On May 25, 2010, AMEX halted trading in China North stock.  Trading remains

halted as of the date this Complaint was filed.

**Disclosure of Misconduct by Corporate Executive/Directors**

58.     On May 27, 2010, the Company filed a Form 8-K with the SEC to disclose that

AMEX had halting trading of its stock, which was signed by Individual Defendant Li.  The Form

8-K stated:

> **Item 3.01 Notice of Delisting of Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing**
>
> On May 25, 2010, the Company received a written notice from NYSE AMEX LLC ("AMEX") advising that the Company is not in compliance with AMEX's continuing listing criteria set forth in Sections 134 and, 1101 of the NYSE Amex LLC Company Guide (the "Company Guide").  Specifically, AMEX noted that the Company has not timely filed its annual report on Form 10-K for the fiscal year ended December 31, 2009 and its quarterly report on Form 10-Q for the quarter ended March 31, 2010 (together, the "Reports").  In addition, AMEX stated that the Company's failure to file its Reports is a material violation of its listing agreement.  Pursuant to 1003(d) of the Company Guide, AMEX is authorized to suspend, and unless prompt corrective action is taken, remove the Company's common stock from AMEX.  AMEX halted trading of the Company's common stock on the same day.
>
> As the Company disclosed in its current report on From [sic] 8-K filed on April 16, 2010, AMEX required that the Company submit a plan of compliance by April 29, 2010 with the action the Company has taken, or will take, to file the 10-K for 2009 and bring the Company into compliance with the listing standards no later than July 14, 2010 (the "Plan").  As AMEX required, the Company submitted its Plan on April 29, 2010, which the Corporate Compliance Department of AMEX currently is evaluating.  As stated in the current notice from AMEX, the Company may supplement its Plan until June 8, 2010.  The Company intends to submit such supplement by June 8, 2010.

59.     The May 27, 2010 Form 8-K also disclosed for the first time that Individual

Defendant Wang, the Company's President/CEO and Chairman, and his mother, who also sat on

the Board, had engaged in improper cash transfers between their personal bank accounts and

those of the Company and its subsidiaries:

**The Company also previously disclosed in a press release issued on April 16, 2010 and as an exhibit to its current report on Form 8-K filed on April 16, 2010, that, in the process of the Company's 2009 year end audit review, the Company identified potential internal control deficiencies over financial reporting in connection with certain expenditures relating to business development activities and the accounting treatment of certain of the Company's accounts payables.** In response, on April 15, 2010, the Board of Directors directed and authorized the Audit Committee of the Board of Directors (the "Audit Committee") to conduct a thorough review of the situation and to determine what corrective action, if any, should be taken.

On April 19, 2010, the Audit Committee retained the services of John Lees & Associates Limited of Hong Kong ("JLA") to conduct a forensic audit of the Company's bank accounts with respect to the expenditures relating to business development activities in question. **The forensic audit preliminarily found that in 2009, cash transfers occurred between the bank accounts of the Company and its subsidiaries and the personal bank accounts of Mr. Hongjun Wang, the Company's chief executive officer, and Ms. Guizhi Ju, a Company director and mother of Mr. Hongjun Wang. The forensic audit has confirmed that some of the transferred funds were used to pay the Company's expenses.** To date, there is no indication that any of the funds were used for personal purposes. The forensic audit is ongoing. [Emphasis added]

60.     The May 27, 2010 Form 8-K then discussed actions taken by the Board to address

the weakness related to the Company's internal financial controls and the misconduct of the

Company's top executives and directors:

Immediately following the JLA preliminary report, on May 6, 2010, the Board of Directors adopted a specific policy that none of its assets, including cash, should be transferred or paid to any officer or director of the Company or its subsidiaries for any purpose without the approval of the Audit Committee other than (i) payment of transfers pursuant to service agreements between the Company and its officers and directors duly authorized and adopted by the Board of Directors or its committees; or (ii) reimbursement of reasonable expenses not exceeding $10,000 in any given week.

After an update of the preliminary report by JLA, the Board called a special meeting to discuss the situation on May 21 and 22, 2010. As a result of these meetings, on May 23, 2010, the Board through unanimous written consent took the following corporate actions:

(i)     **Accepted the resignation of its chief financial officer, Mr. Yang**

**Zhang**, and appointed Mr. Andrew Kan from JLA to serve as interim

acting chief financial officer until a permanent chief financial officer is duly appointed.

(ii)   **Accepted the resignation of Ms. Ju as a director of the Company.**

(iii)  **Accepted the resignation of Mr. Hongjun Wang as the Chairman of the Board but allowed him to continue as a director pending the outcome of the current forensic audit.**

(iv)   Appointed the Company's independent director, Mr. Edward Rule, as Chairman of the Board.

(v)    **Placed Mr. Hongjun Wang on administrative leave as chief executive officer pending the outcome of the current forensic audit.**

(vi)   Appointed the Company's independent director, Mr. Jingfu Li, as the interim acting chief executive officer.

(vii)  Directed that all expenditures of the Company and its subsidiaries over US$10,000 be approved in advance by the Chairman of the Audit Committee.

The Company believes that these remedial measures will prevent further failure of the Company's financial controls and procedures and preserve the assets of the Company. As the forensic audit continues, the Company is treating this serious matter with the utmost urgency. Upon further findings of the forensic audit, the Company will continue to implement measures as the situation demands. [Emphasis added]

61.   On June 28, 2010, Ruishi Hu was appointed to the Board, effective immediately.

62.   On July 15, 2010, China North issued a press release to announce that on July 13, 2010, the Company submitted a request to AMEX for additional time to regain compliance with AMEX's continued listing standards. The release stated: "While the Company has made

significant progress in implementing its compliance plan, management has determined that the

Company will require additional time to fully implement the plan and has asked AMEX for an

additional extension of time until August 31, 2010."

      63.     On August 12, 2010, China North filed a Form 8-K with the SEC to disclose the

resignation of Robert Bruce as director and chair of the Audit Committee.  The 8-K attached

Bruce's resignation letter, which reads as follows:

> Dear Mr. Wang, Mr. Li, Mr. Hu and Mr. Rule,
>
> I am writing to tender my resignation as a member of the board of directors of China North East Petroleum Holdings, Ltd (the "Company" or "NEP"), effective immediately.  I have reached this difficult decision as a result of a conclusion that there is a substantial disagreement between me and you regarding the appropriate action of the Company with respect to further investigation into the Company's prior period SEC filings, internal controls and cash activity.
>
> As I noted in detail in my letter to you dated July 22, 2010, a copy of which I attach and incorporate as part of this letter, I strongly believe that substantial additional investigation is required in order for the Company and/or the members of the board to be confident that the Company's previously filed financial reports and associated financial statements are materially correct under U.S. Generally Accepted Accounting Principles ("US GAAP"), and that the Company has not made payments to government officials as proscribed by the U.S. Foreign Corrupt Practices Act ("FCPA").  In his capacity as Chairman of the board, Mr. Rule responded to my July 22nd letter on August 5, 2010, and presumably did so on behalf of the Company and other members of the board.  In his August 5th letter, Mr. Rule makes it quite clear that he and the Company disagree with and will not support my recommendations.
>
> With all due respect, as I detailed in my July 22nd letter to the board, I believe that the Company can best serve the interests of its shareholders by taking the steps that are necessary to regain confidence that it's [sic] previously filed financial statements, the pending restatements and related internal controls are in compliance with applicable securities laws and regulations.
>
> As noted above, I believe our differing views on this critical question represent a fundamental disagreement that I have with the Company and the board relating to a matter of operation, policy or practice.  Therefore, I believe I have no choice but to tender my resignation, effective immediately, and note that this letter, as well

as my attached letter of July 22, 2010, should be filed as an exhibit as part of the Company's required report under Item 5.02 of SEC form 8-K.

Sincerely,

Robert C. Bruce

**Class Action Lawsuits**

64.     In response to the allegations detailed above, three class actions have been filed in the U.S. District Court for the Southern District of New York.  The complaint in the *Rosado* Action was filed on June 11, 2010; the *Weissmann* Action was filed on June 18, 2010; and the *Moore* Action was filed on July 9, 2010.  Each of the three Class Actions alleges that the Company, and Individual Defendants Wang, Zhang, and Ju violated section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.P.R. § 240.10b-5, in that they "carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period [defined as beginning on August 14, 2009, when the Company filed with the SEC its 10-Q for the second quarter ended June 30, 2009, and ending on May 26, 2010, when trading of its stock was halted] did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase China North's securities at artificially inflated prices."  Each of the Class Actions also alleges that Individual Defendants Wang, Zhang, and Ju, as controlling persons of China North, violated section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## THE INDIVIDUAL DEFENDANTS HAVE DAMAGED CHINA NORTH

65.     As a result of defendants' actions and omissions, the Company has been forced to acknowledge material weaknesses in the Company's internal controls for accounting and

financial reporting and has been forced to restate its financial results for all of 2008 and the first three quarters of 2009. To uncover and remediate this harm, the Company has incurred and will continue to incur substantial costs for consultants, auditors, and legal counsel. The restatement of the Company's financial results has already consumed months of the Company's time and resources. Additionally, the Company has engaged a forensic auditor to conduct an audit of the Company's bank accounts with respect to "certain expenditures relating to business development activities," which include the transfers of money between the private bank accounts of Individual Defendants Wang and Ju and the bank accounts of the Company and its subsidiaries. Furthermore, the Company has suffered damage to its reputation, caused by the delisting of its stock and revelations about the Company's management and internal controls, that will increase the difficulty and cost of accessing capital markets.

66.    The Company will likely also incur significant expenses resulting from the defense of the class action cases filed in this district by defrauded purchasers of China North stock. As a result of those actions, the Company may face exposure to millions of dollars in damages claims for violations of the securities laws. Additionally, if Individual Defendant Wang or Ju is found to have made or authorized improper payments to government officials, the Company may also be forced to pay significant fines and penalties for violations of the U.S Foreign Corrupt Practices Act, which can amount to $2 million per violation of the anti-bribery provisions and up to $25 million for willful violation of the provisions requiring a company to keep accurate books of its transactions and assets and to maintain an effective system of internal accounting controls.

## DERIVATIVE ACTION ALLEGATIONS

67.     Plaintiff brings this action pursuant to Rule 23.1 on behalf of China North to enforce the claims of China North against the Individual Defendants, which may properly be asserted by China North and which China North has failed to enforce.

68.     The wrongs complained of herein occurred during the Relevant Period, during which plaintiff was a China North shareholder.  Plaintiff continues to hold shares in China North and therefore has standing to bring this derivative action on behalf of China North to recover damages for all of the conduct described in this complaint.

69.     Plaintiff will fairly and adequately protect the interests of China North and its shareholders in enforcing the rights of China North against the Individual Defendants.  Plaintiff's attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of China North.  Plaintiff has no interests adverse to China North.

## DEMAND IS EXCUSED FOR FUTILITY

70.     Demand that China North bring this action has not been made and is not necessary because such demand would be futile.  Because a current majority of the Board— Defendants Wang, Rule, and Li—served on the Board during the Relevant Period and are implicated in the acts and omissions alleged herein, they are not disinterested and cannot exercise independent business judgment on the issue of whether China North should prosecute this action.  Under the factual circumstances, a majority of the current Board is more interested in protecting themselves than they are in protecting the company.

71.     Individual Defendant Wang is at the center of the allegations of wrongdoing, both in this derivative action and in the Class Action lawsuits.  The Company has admitted that Wang,

along with his mother, made unauthorized transfers of cash between their private bank accounts and the accounts of the Company and its subsidiaries.  At best, Wang's conduct violated the Company's Code of Conduct, which requires all employees, officers, and directors to "avoid any actual or apparent conflict of interest with the Company"; at worst, the conduct amounted to intentional fraud and/or violations of law.  But even if Wang's actions do not rise to the violation of any law, his actions constitute deliberate misconduct that has caused the Company to suffer significant harm.  Accordingly, there is a substantial likelihood that Wang would be found liable for breach of fiduciary duty.  Wang would be unable under these circumstances to impartially consider plaintiff's demand to bring an action against himself.

72.     In addition, as an officer and director, Wang had the duty to "bring to the attention of the Audit Committee . . . any information [he] may have concerning significant deficiencies in, or violations of, [financial] disclosure controls and procedures."  Here again, Wang knew of significant deficiencies and violations of the Company's internal controls—at the very least, his own unauthorized cash transfers—but intentionally failed to disclose them to the Audit Committee in breach of his fiduciary duty.

73.     There is also a substantial likelihood that Individual Defendants Rule, and Li would be found liable for breach of their fiduciary duties as a result of their having consciously and wholly failed to implement adequate internal controls and to provide oversight of the Company's accounting and financial reporting.  The Company's Code of Conduct specifies that officers and directors of China North are "responsible for establishing, maintaining and periodically evaluating disclosure controls and procedures designed to reasonably ensure full, fair, accurate, timely and understandable disclosure in reports and documents filed with or submitted to the Securities and Exchange Commission or otherwise disclosed to the public."

Defendants Rule and Li utterly failed to carry out these duties in good faith, an egregious and intentional abandonment of their fiduciary duties that resulted in the massive restatement of the Company's financial results.

74.     During the Relevant Period, Rule and Li (and former Audit Committee Chair Bruce) also served on the Board's Audit Committee. As such, Rule and Li were responsible for "monitoring the quality, reliability and integrity of the accounting policies and financial statements of the Company [and] overseeing the Company's compliance with legal and regulatory requirements." Rule and Li were also responsible for "reviewing the independence, qualifications and performance of the Company's internal and external auditors, [and] overseeing the performance of the Company's internal audit function and independent auditors."

75.     Contrary to these duties and responsibilities, the Audit Committee was an utter sham during the Relevant Period. Defendants Rule and Li consciously and egregiously failed to implement and maintain adequate internal controls to ensure the "quality, reliability, and integrity of the accounting policies and financial statements of the Company." Under the circumstances, Rule and Li could not have made a good faith effort to ensure that the Company's independent auditor or its CFO had the necessary qualifications to meet the Company's financial reporting needs. According to the Company's Feb. 3, 2006 Form 8-K, Zhang was 23 years old when he became CFO of the Company and had no prior experience in the oil and gas industry. There were clear signs that Zhang and the Company's independent auditor were not up to the task of preparing the Company's financial reports. China North had been unable to timely file its annual report for 2006 nor its quarterly reports for four consecutive quarters from the second quarter of 2006 to the first quarter of 2007. The Company had also been forced to restate its earnings for the fiscal years 2003 and 2004. Yet, despite the fact that the Audit Committee had

been formed in June 2008 to ensure investors that China North would have effective oversight of its financial disclosures, Rule and Li ignored these red flags. Rule and Li waited until the Company was forced to restate its earnings for all of 2008 and the first three quarters of 2009, in which the Company misstated earnings by at least $28 million (or nearly a third of the Company's total revenues over that same period), before they took any steps to ensure the quality and reliability of the Company's financial reports. Thus, the damage had already been done when the Company announced on April 16, 2010, that it had "*engaged an external consultant with expertise in financial accounting and reporting, including specifically the additional reporting requirements affecting oil and gas producing companies,* to assist with the Company's efforts to maintain effective internal controls over financial reporting." This after-the-fact remedial action does not erase the damage from Rule's and Li's egregious and intentional failure to perform their oversight role between June 2, 2008 and April 16, 2010. As such, Rule and Li are substantially likely to be found liable for breach of their fiduciary duties.

76.     Additionally, as set forth above, Defendants Rule and Li breached their duties to review, in good faith, "disclosures made to the Committee by the Company's President and CFO . . . during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting" and to "[i]nquire and discuss with management the Company's compliance with laws and regulations and with the Company's Code of Ethics."

77.     Individual Defendants Rule and Li have also demonstrated their lack of independence from Individual Defendant Wang and are beholden to him. Most tellingly, despite

31

revelations that Wang engaged in unauthorized and improper transfers of cash between his account and the Company's, Rule and Li allowed Wang to retain his seat on the Board and to retain his position as CEO, merely placing Wang on administrative leave pending the results of a forensic audit.

78.    So too, Wang, as Chairman of the Board and the Company's chief executive, exercised day-to-day control over a Company that was forced to acknowledge that it maintained deficient internal controls over its business development activities and financial disclosures. Whether or not the "certain expenditures related to business development activities" turn out to constitute payments to government officials in violation of federal law, the Company has experienced a failure of management and oversight of the Company's business on a grand scale—failures that resulted in the delisting of the Company's stock and the still-pending restatement of at least seven financial quarters' worth of financial reports. In the aftermath of the Company's disclosures, the Board obtained the resignation of Individual Defendant Zhang as CFO, but not Wang. His continued presence on the Board makes clear that he wields power over the Board and inhibits the independent judgment of Defendants Rule and Li.

79.    The resignation of Audit Committee Chairman Robert Bruce highlights the fact that the current Board of Directors would be unable or unwilling to bring suit on behalf of the Company to enforce the Company's interests against the Individual Defendants. According to his August 8, 2010 letter, Bruce resigned because a majority of the Board was unwilling to take "appropriate action . . . with respect to further investigation into the Company's prior period SEC filings, internal controls and cash activity." The fact that the Board was unwilling to heed the recommendations of the Audit Committee Chairman to conduct "substantial additional investigation" into the Company's previously filed financial reports and to ensure that payments

have not been made to government officials in violation of federal law—forcing Bruce into the extraordinary measure of resigning from the Board—makes clear that it would be futile for plaintiff to demand that this Board initiate a suit against its own members and the Company's top executive related to the same issues.

80.     Because pursuit of the claims in this action on behalf of China North would expose Defendants Wang, Rule and Li, who constitute a majority of the current Board, to a substantial risk of personal liability, they would never vote to bring these derivative claims against themselves. So too, Wang's continuing service on the Board, despite the Company's management and oversight failures and the fact that Wang engaged in improper and possibly fraudulent and/or unlawful conduct, suggests that Wang holds sway over the Board and inhibits the independent judgment of the directors.

## CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTY AGAINST INDIVIDUAL DEFENDANTS

81.     Plaintiff incorporates by reference the allegations set forth above.

82.     In violation of their fiduciary duties to China North and its shareholders, Individual Defendants issued false and misleading statements to China North's shareholders and the investing public regarding the Company's results.

83.     In violation of their fiduciary duties to China North and its shareholders, Individual Defendants engaged in intentional misconduct and/or consciously and wholly disregarded their oversight responsibilities.

84.     By reason of this conduct, the Individual Defendants have exposed China North to potentially massive liability in the Class Actions as well as the significant cost of defending such litigation. The Company has already incurred substantial consulting, auditing, and legal

fees to remedy the harm caused by defendants.  Moreover, China North's reputation in the capital markets has been damaged, hampering the Company's ability to secure financing and/or increasing its costs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of China North, demand judgment against defendants and each of them jointly and severally as follows:

A.   determining that this suit is a proper derivative action and certifying plaintiff as an appropriate representative of China North for said action;

B.   declaring that each of the Individual Defendants breached his or her fiduciary duty to China North;

C.   determining and awarding China North the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D.   awarding plaintiff the costs and disbursements of this action, including reasonable fees and costs to plaintiff's attorneys, accountants and experts;

E.   granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 23, 2010

**COHEN MILSTEIN SELLERS & TOLL PLLC**

By: _____

**RICHARD A. SPEIRS (RS-8872)**

88 Pine Street, 14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
Facsimile:  (212) 838 7745
Email: rspeirs@cohenmilstein.com

Robert C. Schubert
Willem F. Jonckheer
**SCHUBERT JONCKHEER & KOLBE LLP**
Three Embarcadero Center, Suite 1650
San Francisco, CA  94111
Telephone:  (415) 788-4220
Facsimile:  (915) 788-0161
Email: rschubert@schubertlawfirm.com
Email: wjonckheer@schubertlawfirm.com

Aaron H. Darsky
**AARON DARSKY, P.C.**
345 Franklin Street, Suite 103
San Francisco, CA. 94103
Telephone: (415) 515-4220
Facsimile:  (877) 591-2880
Email: aaron@darskylaw.com
***Counsel for Derivative Plaintiff***

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHERWIN DROBNER,
                  Plaintiff,

    vs.

WANG HONGJUN, ROBERT C. BRUCE,
EDWARD M. RULE, LI JINGFU, YU
LIGUO, JU GUIZHI, ZHANG YANG DIO,

               Defendants,

  --and--

CHINA NORTH EAST PETROLEUM
HOLDINGS LIMITED, a Nevada Corporation,

            Nominal Defendant.

Civil Action No. _____

---

## VERIFICATION OF SHERWIN DROBNER

I, Sherwin Drobner, hereby declare under penalty of perjury as follows:

I am the plaintiff in this action. I have read the attached shareholder derivative complaint and authorize its filing. To the extent the allegations in the complaint are based on my personal knowledge, they are true; to the extent they are based on information and belief through the investigation of my counsel, I believe them to be true.

Dated: August __, 2010

                                      Sherwin Drobner